IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

    v.                                                                            Criminal No. 3:09cr156 (DJN)

CHRISTOPHER WOOLRIDGE,
        Defendant.

**MEMORANDUM OPINION**
**(Denying Motion for Compassionate Release)**

On September 22, 2009, Defendant Christopher Wooldridge ("Defendant") pled guilty to one count of Distribution of a Detectable Amount of Cocaine Hydrochloride pursuant to 21 U.S.C. § 841. On December 14, 2009, then-United States District Court Judge James R. Spencer sentenced Defendant to 292 months' imprisonment with 6 years' supervised release. On March 7, 2016, Defendant filed a Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(2), which the Court granted on June 10, 2016, with a reduction in sentence from 292 months' imprisonment to 235 months.

This matter now comes before the Court on Defendant's Motion for Compassionate Release (ECF No. 176), which moves pursuant to 18 U.S.C. § 3582(c)(1)(A) for Defendant's release in light of his medical conditions and the outbreak of Coronavirus Disease 2019 ("COVID-19"). For the reasons set forth below, the Court hereby DENIES Defendant's Motion (ECF No. 176).

## I. BACKGROUND

### A. Defendant's Underlying Offense

Beginning in 2003 and continuing through May 2009, Defendant acted as a distributor of cocaine hydrochloride. (November 30, 2009, Presentence Investigation Report ("PSR") (ECF No. 180) ¶ 7.) His distribution activities primarily involved obtaining wholesale quantities of cocaine hydrochloride and redistributing the cocaine hydrochloride to lower-level distributors for redistribution. (PSR ¶ 7.) Over the course of his distribution activities, Defendant distributed or possessed at least 15 kilograms, but less than 150 kilograms of cocaine hydrochloride. (PSR ¶ 7.) On August 14, 2008, Defendant distributed 124.5 grams of cocaine hydrochloride to an undercover police officer. (PSR ¶ 7.) Again, on September 12, 2008, Defendant distributed 122.0 grams of cocaine to an undercover police officer. (PSR ¶ 7.)

### B. Procedural History

On May 19, 2009, the Court issued an arrest warrant for Defendant, and Defendant made his initial appearance on May 22, 2009. (ECF Nos. 3, 4.) On September 22, 2009, Defendant pled guilty to one count of Distribution of a Detectable Amount of Cocaine Hydrochloride, in violation of 21 U.S.C. § 841. (PSR ¶ 2.) Additionally, the Government filed an Information charging Defendant with a prior drug conviction, enhancing the penalty for the above offense in accordance with 21 U.S.C. § 851. (PSR ¶ 2.) On December 14, 2009, then-Chief United States District Judge James R. Spencer sentenced Defendant to 292 months' imprisonment, 6 years' supervised release and a $100 special assessment. (ECF No. 72.)

On March 7, 2016, Defendant filed a Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(2), asking the court to reduce his term of imprisonment from 292 months to 235

months. (ECF No. 166.) On June 30, 2016, the Court granted Defendant's Motion and reduced Defendant's sentence to 235 months. (ECF No. 172.)

### C. Defendant's Motion for Compassionate Release

After Defendant began serving his sentence, the first cases of COVID-19 emerged in the United States, including within the federal prison system. *See* Fed. Bureau of Prisons, *COVID-19 Coronavirus*, www.bop.gov/coronavirus (showing updated figures on the number of inmates and prison staff who have tested positive for COVID-19). In response, on October 27, 2020, Defendant moved for compassionate release pursuant to § 3582(c)(1)(A). (Mem. In Supp. Of Mot. For Compassionate Release ("Def.'s Mot.") (ECF No. 176) at 1-2.)

In support of his Motion, Defendant argues for early release, because his medical conditions render him particularly susceptible to COVID-19. (Def.'s Mot. at 1-2.) Specifically, Defendant avers that he suffers from diabetes, high blood pressure and sleep apnea, which he maintains increases the likelihood of COVID-19 complications should he contract the disease. (Def.'s Mot. at 1-2.) Defendant further contends that he has a particularized risk of contracting COVID-19, because the Bureau of Prisons ("BOP") facility that houses Defendant has reported incidences of the disease. (Def.'s Mot. at 2.) Specifically, Defendant notes that while FCI Gilmer — the facility where BOP houses Defendant — had only three inmates test positive for COVID-19 as of October 27, 2020, the virus has the potential to spread rapidly in this densely populated environment, and FCI Gilmer lacks the resources to contain the virus and prevent its spread. (Def.'s Mot. at 2.) Defendant later noted in an addendum to his Motion that as of December 2, 2020, the number of active COVID-19 cases among inmates had increased to twenty, with one staff member then also positive for the disease. (Addendum to Mot. For Compassionate Release ("Addendum") (ECF No. 178).)

3

As for whether his release comports with the relevant § 3553(a) factors and policy statements, Defendant argues that he will not present a danger to the community if released and that his release plan adheres to the mandates of § 3553(a). (Def.'s Mot. at 2.) Defendant notes that he has received a significant reduction in his active incarceration balance due to "good time" credit, and that, as a result, he only has 32% of his sentence remaining. (Def.'s Mot. at 22.) Moreover, Defendant has achieved significant accomplishments while incarcerated, including earning his GED, taking classes to develop his job skills and participating in 44 different programs on his Individualized Reentry Plan. (Def.'s Mot. at 23.) Defendant works as a unit orderly and has received no disciplinary incidents in the last six months. (Def.'s Mot. at 23.)

Finally, Defendant argues that he has a viable release plan, which involves living with his grandmother in Richmond, Virginia. (Def.'s Mot. at 21.) He plans to work at Sutliff Tobacco Company's manufacturing plant, also in Richmond, and intends to participate in the Clean Slate program, an outpatient drug treatment program. (Def.'s Mot. at 24-25.)

The Government filed its Response to Defendant's Motion on December 16, 2020, (Gov't's Resp. in Opp'n to Def.'s Mot. for Compassionate Release ("Gov't Resp.") (ECF No. 183)), and Defendant filed his Reply in Support of Compassionate Release on December 21, 2020 (Def. Reply in Supp. of Compassionate Release ("Def.'s Reply") (ECF No. 184), rendering the matter now ripe for review.

## II.   STANDARD OF REVIEW

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify a criminal defendant's sentence for "extraordinary and compelling reasons" "upon motion of the Director of the Bureau of Prisons" or "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

4

on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i). By its plain language, § 3582(c)(1)(A) requires defendants to first exhaust administrative remedies or wait thirty days after requesting that the warden of their facility file a motion for a sentence reduction; however, courts have waived this requirement when enforcing it would prove futile. *See, e.g., Washington v. BOP*, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (explaining in addressing motion for recalculation of good time credit under First Step Act that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile").

Once the administrative remedies under § 3582(c)(1)(A) have been exhausted or waived, the Court may reduce or modify a sentence when "extraordinary and compelling reasons warrant such a reduction." In determining what constitutes "extraordinary and compelling reasons," courts have considered related policy statements under the United States Sentencing Guidelines, though such statements are not binding. *See, e.g., United States v. Beck*, 425 F. Supp. 3d 573, 582 (M.D.N.C. 2019) (considering what the Sentencing Guidelines defined as "extraordinary and compelling reasons"). These policy statements provide that a defendant's medical conditions, age, family circumstances or other circumstances, either singly or in combination, can prove sufficiently extraordinary and compelling to justify compassionate release. U.S.S.G. § 1B1.13, application notes 1(A)-(D).

However, to be extraordinary and compelling, a defendant's medical conditions must be either "terminal . . . with an end of life trajectory" or must "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, application note 1(A). Similarly, a

5

defendant may be released based on his advanced age when he "is at least 65 years old," "is experiencing a serious deterioration in physical or mental health because of the aging process" and "has served at least 10 years or 75 percent of his or her term of imprisonment." § 1B1.13, application note 1(B). Defendants may also seek compassionate release based on family circumstances, including when the caregiver of a defendant's minor child has died or become incapacitated, or when the defendant's spouse or partner has become incapacitated and the defendant constitutes the only available caregiver. § 1B1.13, application note 1(C). Finally, the Sentencing Guidelines contemplate situations in which "there exists in the defendant's case an extraordinary and compelling reason [for compassionate release] other than, or in combination with, [the defendant's medical conditions, age and family circumstances]." § 1B1.13, application note 1(D).

Relevant here, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. Feiling (Feiling I)*, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020) (citing *United States v. Dungee*, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020); *United States v. Edwards*, 451 F. Supp. 3d 562, 568 (W.D. Va. Apr. 2, 2020)). "To establish a particularized risk of contracting COVID-19, an inmate must first demonstrate that cases of COVID-19 have emerged at his facility." *United States v. Feiling (Feiling II)*, 2020 WL 5047064, at *7 (E.D. Va. Aug. 26, 2020). However, even then, "COVID-19 and an inmate's susceptibility to it do not justify compassionate release when . . . the inmate refuses additional protections afforded to him by the BOP without good cause and continues to voluntarily place himself in an environment in which he faces the highest risk of contracting the disease." *Id.*

6

Even if extraordinary and compelling reasons exist for a defendant's compassionate release, § 3582(c)(1)(A) requires courts to consider "the factors set forth in section 3553(a) to the extent they are applicable" and "applicable policy statements issued by the [United States] Sentencing Commission" before granting a sentence modification. To that end, § 3553(a) requires courts to consider, among other factors, the nature and circumstances of the underlying offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(1)-(2). Additionally, the Sentencing Commission has advised courts to consider whether, based on the factors set forth in 18 U.S.C. § 3142(g), a defendant would present a danger to the safety of any other person or the community if released.[1] U.S.S.G. § 1B1.13(2). And the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated, alone, proves insufficient to warrant a sentence reduction. § 1B1.13, application note 3.

Ultimately, the Court may grant compassionate release only after a defendant establishes an extraordinary and compelling reason for his release and the Court finds that the defendant's

---

[1] As modified in the context of a compassionate release motion, before releasing a defendant, courts should consider: (1) the nature and circumstances of the offense of conviction, including whether the offense is a crime of violence, a violation of § 1591, a terrorism offense, or an offense involving a minor victim, controlled substance, firearm, explosive or destructive device; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including his or her character, physical or mental condition, family and community ties, financial resources, history of substance abuse and criminal history, as well as whether at the time of the instant offense, the defendant was on a period of probation, parole or other form of release; and, (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g)(1)-(4).

release would not undermine the relevant § 3553(a) factors or any relevant policy statements issued by the Sentencing Commission.

### III. ANALYSIS

#### A. Defendant Does Not Demonstrate that Extraordinary and Compelling Reasons Entitle Him to Compassionate Release.

Defendant must show that his circumstances present "extraordinary and compelling reasons" entitling him to compassionate release. Defendant argues that the heightened risk of contracting COVID-19 in prison coupled with his preexisting health conditions could result in a high risk of developing serious COVID-19 complications. (Def.'s Mot. at 11.) Defendant contends that his Type II diabetes, sleep apnea and high blood pressure could prove fatal should he contract the disease. (Def.'s Mot. at 17.) Defendant also maintains that the measures taken by the BOP to reduce the spread of COVID-19 prove inadequate, given the nature of the disease and the inability for inmates to practice social distancing, increased hygiene and other health and safety measures that have proven effective in managing this disease in other contexts. (Def.'s Mot. at 19-20.)

In response to Defendant's Motion, the Government argues that Defendant has not established extraordinary and compelling reasons entitling him to compassionate release. (Gov't Resp. at 9.) Specifically, the Government contends that Defendant has established neither a particularized susceptibility to COVID-19, nor a heightened risk of contracting the disease at his prison facility. (Gov't Resp. at 9-10.) The Government acknowledges that Defendant does have sleep apnea, high blood pressure and diabetes, and that these conditions could place him at higher risk of COVID-19 complications. (Gov't Resp. at 10.) However, the Government contends that chronic conditions that can be managed in prison prove insufficient bases for compassionate release. (Gov't Resp. 10.) Defendant's medical records demonstrate that

8

Defendant's conditions can be managed in prison, and thus do not warrant his release. (Gov't Resp. at 11.)

Moreover, the Government argues that Defendant has not shown that he has a heightened risk of contracting COVID-19 at his prison facility. (Gov't Resp. at 11.) At the time of the Government's Response, FCI Gilmer had reported only eight active cases of COVID-19 among an inmate population of 1404, and zero COVID-19-related deaths. (Gov't Resp. at 11.) The Government notes that Defendant would likely encounter increased exposure to COVID-19 upon his release and return to work in the City of Richmond, which has reported a significantly higher percentage of cases and deaths than Defendant's prison facility. (Gov't Resp. at 11-12.)

As a threshold matter, neither party contends that Defendant has failed to exhaust his administrative remedies under § 3582(c)(1)(A). Defendant states that he submitted a request for compassionate release to the warden at FCI Gilmer, and received a denial letter on June 23, 2020. (Def's Mot. at 5.) On June 24, 2020, Defendant submitted a Request for Administrative Remedy and more than 30 days passed before the warden responded on August 19, 2020. (Ex. 4 to Def.'s Mot. (ECF No. 176-2) at 1.) Accordingly, the Court finds that Defendant has exhausted the administrative remedies outlined under § 3582(c)(1)(A) and that the Court has jurisdiction to consider the merits of Defendant's Motion.

To that end, the Court finds that Defendant has not established an extraordinary and compelling reason for his release. As mentioned, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *Feiling I*, 453 F. Supp. 3d at 841 (citations omitted). To establish a particularized susceptibility to COVID-19, courts have required

9

defendants to provide evidence that they suffer from a medical condition identified by the Centers for Disease Control and Prevention ("CDC") as a COVID-19 risk factor. *See, e.g.*, *United States v. Beahm*, 2020 WL 4514590, at *2 (E.D. Va. Aug. 5, 2020) (finding the defendant particularly susceptible to COVID-19, because the defendant suffered from type II diabetes, which the CDC has identified as a COVID-19 risk factor); *United States v. White*, 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) (finding that the defendant had a particularized susceptibility to COVID-19, because he suffered from several medical conditions identified as COVID-19 risk factors). Indeed, a general fear of contracting COVID-19, without a sufficient basis for that fear, does not provide an extraordinary and compelling reason for a defendant's release. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society . . . cannot independently justify compassionate release."); *Feiling I*, 453 F. Supp. 3d at 841 ("Notably, 'the *fear* of contracting a communicable disease' proves insufficient to justify a sentence modification." (quoting *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (emphasis added))).

Consistent with this principle, courts have regularly found that diabetes combined with other health conditions establishes a particularized susceptibility to COVID-19. *See, e.g.*, *United States v. Patel*, 2020 WL 3187980, at *8 (D. Conn. June 15, 2020) ("Defendant's age group, heart disease, diabetes, and hypertension place him at high risk for developing a severe case of COVID-19); *United States v. Rountree*, 460 F. Supp. 3d 224, 235 (2020) ("[Defendant's] diabetes and hypertension place him at high risk for developing a severe case of COVID-19 . . ."); *United States v. Pabon*, 458 F. Supp. 3d 296, 298 (E.D. Pa. 2020) (finding it more likely that defendant would experience dangerous symptoms of COVID-19 given his diabetes and high blood pressure). Therefore, Defendant has established a particularized susceptibility to COVID-

10

19, as he suffers from a combination of several pre-existing conditions, including diabetes and sleep apnea. (Def.'s Mot. at 1.) His medical records confirm these diagnoses. (Med. R. at 1.)

However, Defendant has failed to demonstrate a particularized risk of contracting the disease. As of January 27, 2021, FCI Gilmer reported only ten positive cases of COVID-19 among its inmate population. *See* Fed. Bureau of Prisons, *COVID-19 Coronavirus*, www.bop.gov/coronavirus (showing updated figures on the number of inmates and prison staff who have tested positive for COVID-19). Thus, since Defendant filed his Motion, the number of active cases of COVID-19 has remained relatively low. Approximately 291 inmates and 33 staff members have recovered. *Id.* No COVID-19 related deaths have occurred. *Id.* According to the Government, the facility continues to adhere to its modified operations plan, including restricting prisoner movement within the facility, using screening and testing protocols and providing masks and hand cleaners. (Gov't Resp. at 11.) Moreover, as the availability of the COVID-19 vaccine continues to increase in the coming months, especially for individuals in correctional facilities, the risk posed by COVID-19 to inmates will likely continue to decrease. *See* Fed. Bureau of Prisons, *COVID-19 Vaccine Guidance*, https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf (detailing COVID-19 vaccination plan and guidance for BOP inmates and staff members). Considering the low number of active cases of COVID-19 among the inmates at FCI Gilmer, the other operational changes that the facility has implemented to prevent the spread of the disease and the commencement of the COVID-19 vaccine distribution, the Court cannot conclude that Defendant has established a particularized risk of contracting the disease.

Even if Defendant could establish a particularized risk of contracting the disease, Defendant fails to establish how his release on home confinement presents a viable alternative

11

sentence. His release to his grandmother's home will certainly present its own risks to Defendant's health, the health of his family and public safety. *Feiling I*, 453 F. Supp. 3d at 841; *see also United States v. White*, 2020 WL 3443171, at *6 (E.D. Va. June 23, 2020) ("[I]t is not clear to this Court that Defendant would be safer from the virus on home confinement.") For one, Defendant's grandmother also falls within the high-risk demographic due to her age — according to Defendant's PSR, she would be at least 89 years old at the time of his release to her home. (PSR ¶ 55.) Defendant's work in a tobacco manufacturing plant would presumably compound the risks to his grandmother's health by increasing her contact with the public and potential avenues of exposure to COVID-19.

In addition, Defendant fails to demonstrate how his release will significantly reduce his likelihood of contracting COVID-19. As mentioned, FCI Gilmer currently has just under a dozen active cases of COVID-19. The facility has reported no COVID-19-related deaths. However, as of January 27, 2021, the City of Richmond, where Defendant plans to live and work upon his release, has reported 12,321 cases of COVID-19 and 124 deaths. *See* Va. Dep't of Health, *COVID-19 in Virginia: Locality*, https://www.vdh.virginia.gov/coronavirus/coronavirus/covid-19-in-virginia-locality/ (showing updates figures regarding number of COVID-19 cases in Virginia). This statistic equates to 5,385 cases per 100,000 individuals, a number much more significant than the number reported in FCI Gilmer. As such, COVID-19 presents an equal, if not greater, threat to Defendant should the Court release him on home confinement.

For these reasons, Defendant has not established that "extraordinary and compelling reasons" entitle him to compassionate release.

### B. The Court Finds that the § 3553(a) Factors Do Not Support Defendant's Release.

The Court also finds that the § 3553(a) factors do not support Defendant's release. In support of his Motion, Defendant argues that he will not present a danger to the community if released, because his criminal history contains only one crime of violence conviction from when he was 19 years old, and he has earned significant "good time" credit while incarcerated. (Def.'s Mot. at 22-23.) While in custody, Defendant has earned his GED, taken classes, participated in programs to develop his job skills and served as a unit orderly. (Def.'s Mot. at 23.) Defendant has also maintained the support of his family and friends while incarcerated. (Def.'s Mot. at 23.) Defendant contends that these achievements reflect the insight that he has developed while incarcerated into what he must do in order to be a good citizen. (Def.'s Mem. at 24.) Defendant further contends that he has a viable release plan, which includes living with his grandmother in Richmond, Virginia, and working at Sutliff Tobacco Company's manufacturing plant. (Def.'s Mem. at 24-25.) He also intends to attend the Clean Slate program, an outpatient drug treatment program. (Def.'s Mem. at 25.)

The Government argues that the relevant § 3553(a) factors and policy statements counsel against granting a reduction in Defendant's sentence. (Gov't Resp. at 14.) The Government asserts that Defendant remains a danger to the community, noting that his underlying drug crime constituted a serious offense — Defendant sold large quantities of cocaine over five years and often carried firearms with him. (Gov't Resp. at 14-15.) Additionally, Defendant was only 36 years old at the time of his conviction and had already qualified as a career offender based on a prior drug trafficking conviction and robbery conviction. (Gov't Resp. at 15.) He had earned a criminal history category VI based on these prior convictions. (Gov't Resp. at 15.) Moreover, during each period of supervision for his prior offenses, Defendant failed to comply with the

13

conditions of supervision and reoffended. (Gov't Resp. at 15.) The Government acknowledges that significant time has passed since his robbery and drug trafficking convictions in 1993, but notes that Defendant served 10 years on these convictions and still returned to serious criminal conduct upon his release. (Gov't Resp. at 16.) It appears that this lengthy period of incarceration did not serve to deter Defendant. (Gov't Resp. at 16.)

The Government also argues that Defendant has demonstrated a continued failure to respect the law since his most recent conviction, pointing to several offenses for possession of unauthorized items that he has acquired while incarcerated. (Gov't Resp. at 16.) The Government notes that many of the accomplishments that Defendant has achieved while incarcerated were completed prior to or concurrent with his disciplinary infractions, demonstrating that his achievements have not reduced the risk that Defendant will reoffend upon his release. (Gov't Resp. at 17.)

The Court agrees with the Government and finds that the relevant § 3553(a) factors do not support Defendant's compassionate release. For one, Defendant's instant offense follows an extensive criminal history, which started at age 14. (PSR ¶ 31.) Specifically, his criminal history includes several drug and theft-related offenses, including a distribution of cocaine conviction at age 19. (PSR ¶ 35.) Defendant received 10 years' imprisonment for this conviction, suspended conditioned upon completion of certain programming and good behavior, yet the court revoked his suspended sentence within a year after Defendant was convicted of robbery. (PSR ¶ 36.) Defendant received 20 years' imprisonment for this conviction, with 10 years suspended conditioned on good behavior. (PSR ¶ 36.) According to Defendant's PSR, he exhibited little remorse for his actions. (PSR ¶ 36.) Moreover, after serving the sentences for these offenses, Defendant again reoffended in 2003, and accumulated several other convictions

14

between then and the instant offense. (PSR ¶¶ 37-40.) Defendant qualifies as a Career Offender. (PSR ¶ 49.)

The fact that Defendant served a lengthy term of incarceration for a drug trafficking offense, but returned to similar criminal conduct evinces a lack of respect for the law and inability to learn from his past. For these reasons, Defendant's risk of recidivism remains high and cautions against his early release. Defendant's plan for release does little to influence this analysis. Additionally, while the Court commends Defendant for the accomplishments he has achieved while incarcerated, they do not outweigh the Court's findings as to the other factors. Indeed, as the Court has stated, Defendant's rehabilitation alone proves insufficient to warrant a sentence reduction.

Together, both the nature and circumstances of Defendant's underlying offense and his criminal history weigh against his release. Ultimately, even if extraordinary and compelling reasons did exist for Defendant's compassionate release, the Court, in its discretion and after considering the relevant § 3553(a) factors and policy statements, finds that releasing Defendant at this time would not adequately protect the public, promote respect for the law, deter Defendant and others from engaging in similar conduct or reflect the seriousness of Defendant's offense. Accordingly, the Court DENIES Defendant's Motion for Compassionate Release.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant's Motion for Compassionate Release (ECF No. 176). An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

                                                                                           /s/  
                                                                                           David J. Novak  
                                                                                           United States District Judge

Richmond, Virginia  
Dated: February 5, 2021